Mr. Hager, is that the way? Yes. All right. Thank you. You may proceed. Thank you, Your Honor. The arbitration provision in this case provides AT&T and you agree to all disputes and claims in both is between us. This agreement to arbitrate is intended to be broadly interpreted and then it gives a list of an illustrative but non-exclusive list of claims that are subject to the arbitration provision. And it further defines AT&T to Ms. May's TCPA claim against DIRECTV because DIRECTV is an affiliate of AT&T and, quote, all disputes and claims between an AT&T affiliate and customer who accepted the wireless service agreement are arbitrable. Okay. Can I ask you a question? So on this theory where DIRECTV becomes an affiliate, let me just tell me where I'm going wrong. Say I sign up for my mobility service in 2010 and I cancel it the next year. I've been a loyal Verizon customer since then, but I understand your agreement applies even after the service agreement is canceled, right? My arbitration agreement continues to bind me? Yes, literally, by its terms. So for a year in 2010, I had mobility service. After that, let's assume AT&T acquires CNN. And then after that, CNN defames me. You're saying that because for one year I had that cell phone service with mobility, I've waived my right to sue CNN? Excuse me for defamation. Yes, that's the literal language of the contract. And I know that may be disconcerting. It's not that it's disconcerting. It's that it's hard for me to believe that you have understood it to mean that. Well, I'd like to refer the court. And I don't mean subjectively. I mean, objectively, I'm not seeing what in that agreement would put anyone on notice that they just waived their right to sue CNN after it was later acquired by the same parent company as the person who did 10 years ago give me my wireless service. I'd like to refer the court to the Eighth Circuit's decision in Palm v. Bluestem, which is February. It's at 898 F. 3rd, 869. And the critical language is at page 878, because the both the plaintiff, both the plaintiffs and the district court in that case engaged in the same kind of sort of far out hypotheticals about, you know, what is it far out? I don't I was drinking on the bench again. I mean, how far? Well, far out in the sense that it's not the case before the court. And the Eighth Circuit was quite clear in saying we are not going to decide this case about the scope of the arbitration agreement and whether the plaintiff is subject to the arbitration agreement by looking at hypotheticals that don't apply. I'm just trying to figure out what the word affiliate means in the context of this agreement. And I am having trouble figuring out why we would read affiliate in a way that invites, you know, that doesn't require any great genius to come up with all of the things that that might mean in And most of the words in in that definition of what AT&T or you mean are ones that are not fixed in time. So for example, you have agents, you have employees, clearly, agents and employees are going to change over time. So it can't be the case that at the time the plaintiff signs this arbitration agreement in 2012, only and then there are later lawsuits in which employees are defendants, that only employees who are employees at the time she entered into the agreement can be sued. Well, use them generous seems like it would cut both ways here, because all of those terms, to me signify entities that might be doing some work related to the wireless service that you just contracted for, right? If you can't sue mobility, you also can't sue the employees who are working on your service. You can't sue a successor or an assignee who takes over mobility's obligations to provide you with wireless service. But it just looking at that list, it looks like what this provision is about is you can't evade your arbitration agreement by saying fine, fine, I won't sue mobility, I'm going to sue the particular employee who messed up my service, or the affiliate who's doing the billing on my wireless contract. You can't sue someone, any entity that's sort of standing in the shoes of mobility to provide this service. That's what that list looks like to me when you look at use them generous. I have two responses to that. First, the plaintiffs concede at page 29, I believe it is of their own, that it would apply if DirecTV was already a subsidiary and made the phone call to the plaintiff. So they're not making the argument that it has to be connected to the provision of telecommunication services. Secondly, of course, when you're talking about the meaning of the words in the agreement, if there is any ambiguity, and we don't think there is, we think that it is not temporally limited, and therefore it has to be interpreted to include future affiliates. But if the court thinks that there's a debate on that, the presumption in favor of arbitrability then kicks in. We have all those cases, I understand your point on that, but we do have a lot of cases in the to the agreement who has agreed to arbitrate against whom, the who question, that that's a formation question and that we don't apply the presumption. And that's true even when in order to decide who is a party, you're looking at terms in the agreement, like who counts as a customer. We say that's a formation question and there's no presumption. I don't think it's a formation question. I know you don't think that, but my court appears to. Well, the Supreme Court in Granite Rock seems to draw the line between is there an agreement at all? There is. And then the rest goes to interpretation, and then the presumption kicks in. Let me ask you as a practical matter. Her husband signed the original contract. Correct. We're under West Virginia law. She goes in and signs a little wireless agreement, and she has in front of her a print option, which would have printed out the entire contract, including what her husband signed. And I don't think she did, but the arbitration clause is in that portion that she didn't print out. So is your argument that she's bound as a non-signatory by incorporation? Well, she's a signatory. If you look at page 86 of the joint appendix, there is the paragraph in which she acknowledges reviewing and agreeing to all of the terms and conditions and signs it herself. So she has her own contract now with AT&T, and that references specifically the arbitration provision. So yes, it is incorporated into what she agreed to in 2012. Do you happen to know what percentage, I don't, of adult Americans at any time has had a mobility wireless contract? I don't either. We know how many total customers they have at any point in time, and I'm thinking, is it around 100 million now, or about 100 million now? Okay, so it would be larger than that, people who have ever had a mobility contract, because I'm really struck by the temporal thing here, that if at any point in your life you have had a wireless contract with mobility, for the rest of your life, you can't sue any company that AT&T might acquire for any reason. Taking literally, that isn't... Well, you want us to take it literally, right? Well, I'm not arguing that case right now. It's very likely that... Can you point me to any language that would make that not so? I cannot. Okay, all right. Does that also apply to... Go ahead. I think what the... Isn't that sort of stunning, that hundreds of millions of Americans, when they check that box saying, I want my wireless service from mobility, at that point, they waive their right to sue for any reason, any company that is later acquired by AT&T, and that lasts for the rest of their lives. They can cancel their mobility contract. It doesn't make any difference. Employment discrimination, someone runs you over with a car, doesn't matter. That may be a state law question of unconscionability, which could be raised at the time if AT&T were confronted with that kind of claim and were to elect to move to compel arbitration. But again, as the Eighth Circuit said, you don't need to look at that hypothetical in order to resolve this case. But when we look at the word affiliate, we are instructed to construe that word in the context, I mean, you tell us this all the time, in the context of the whole agreement. So I'm looking at affiliate, and I'm looking at it with this quite broad temporal sweep, and with this quite broad sort of subject matter scope. And I'm thinking that in light of all of that, surely affiliate could not have been intended to mean any later acquired company, whether or not it has anything to do with the wireless service that's being contracted for. The intention was to include, to have the broadest possible scope. And that is what that word does. The word agent, the word employee, the word authorized user, the word unauthorized user, none of those are temporally limited. The point was, at the time this was drafted, that we couldn't answer- Can I ask you a question along those lines? Pardon me? Can I ask you a question along those lines of the scope? Judge Harris referenced reading the whole contract together, and you are just to do that too, and everyone does. You say it should be broad, but we have this list of categories, and I know it says includes, but it's not limited to. But surely this list of categories helps us understand what the arbitration provision covers and perhaps limits its scope somewhat. If an affiliate is engaged in some of these bullet-pointed claims arising out of or related to any aspect of the relationship, does that help define whether, you know, CNN defaming you as in or out, or DirecTV calling you to solicit businesses in or out, or do you reject the argument that that defines the scope? The reason why we wrote the bullet points was just to give some illustrations, because at the time that this was last revised and they were included, the argument was being made that customers don't have a good enough sense of what claims are covered, because all you say is all disputes and claims. So in an effort to put, you know, give people a sense of, these were the sort of the heartland of the claims. These are the ones that we knew about that we could, you know, we can envision, and so we put them in there. You know, whenever you're drafting an arbitration clause, you could write something that's 30 pages long, right? Or you could try to just give people the examples that are sort of going to make, that are going to apply the most frequently. And that makes sense, right? That you would say all disputes and claims, but you try to give examples to help people understand the universe of claims that are covered. It doesn't define the universe. It doesn't limit, it doesn't define the outer limits. But if we, should we read all disputes and claims in light of the bullet points that come after it? Again, not limiting it to that, but saying that that helps inform whether you really mean someone who gets run over by a CNN reporter's truck 20 years later. Well, it might be possible to construe it in a limiting fashion that way. But, you know, my, then we would have to have this whole fight that would sort of lead to a fight. Okay, so what about the TCPA claim? And we feel quite strongly that that claim is within the scope of the broader part. So yes, we argue as a fallback that it does relate to the relationship and it is a statutory claim and it does involve advertising. So we make all of those arguments as the fallback, but the cleaner, easier argument or answer that I think should satisfy the entire panel is it falls within the main sentence. Unless the court has other questions, I will. You've got some time. Thank you, Your Honor. Mr. Donovan. Thank you, Your Honor. May it please the court. Always an honor to be here. It's not surprising that DirecTV's argument focuses on scope. I mean, we all understand that scope can be, is a difficult issue under the FAA and in light of the Moses H. Cohn rule, often repeated that any ambiguity about the scope of arbitrable issues has to be resolved in favor of arbitration. I'd offer that that is probably one of the most frequently and poorly paraphrased rules in the law because you see it over and over again in briefs and unfortunately sometimes in opinions described as any dispute or any ambiguity about an arbitration agreement has to be resolved in favor of arbitration. But that's not true. What we're talking about here, from our perspective, the issues in this case are issues of contract formation. And as this court has said in the Sidnor case and the many other cases that Judge Harris referenced, as then Judge Gorsuch said in the Howard v. Farrell gas case, everyone understands this sort of heavy-handed presumption in favor of arbitration once there is an arbitration agreement. But there is no such presumption on the issue here, which is the threshold issue of whether or not the plaintiff, in this case, Diana May, ever entered into any kind of contract containing an arbitration agreement with Direct TV. And the answer to that we would offer is, of course, no. We look at basic contract principles. What is the first element under state law, West Virginia state law in particular, but any state's law, of contract formation? It's an agreement between two parties, two or more parties. And that is something that we don't have here in this case. Is Direct TV an affiliate of AT&T, your friend on the other side said you didn't contest that currently Direct TV is an affiliate? We don't contest that Direct TV is now in 2020 or in 2017 at the time this case arose an affiliate. We do, of course, contest that. I think AT&T likewise would not contest that Direct TV was not an affiliate at the time, certainly in 2005, when Mark May, Diana's husband, entered into the original arbitration agreement, nor in 2012, when Diana May, the plaintiff in this case, acknowledged, I think is how it's referred to. That's kind of an interesting question. What would you say if Direct TV were an affiliate at those points in time, but was no longer an affiliate in 2017 when the statutory violation allegedly occurred? Well, that would be a different case, of course. But we would urge the court in that case to apply the language of the, if they were an affiliate at that time and there were a reason, as I think Judge Harris alluded to, to believe that an objective individual agreeing to this contract at the time in 2012 would have known that Direct TV was an affiliate, then obviously people can contract, could have contracted for that, even if Direct TV and AT&T were involved in very different things. So if Direct TV was an affiliate at the time she signed the contract, or her husband signed the contract, or both, but was no longer an affiliate at the time that the alleged statutory violation occurred, you agree they would be considered an affiliate under the contract? They would be considered an affiliate. I think this court's case is in precedent of requiring some significant relationship between the issues being to be arbitrated and the underlying contract. The Long case, for example, Long v. Silver would still apply, but they certainly would under the plain language of the contract have been an affiliate. You can't argue with that. And so, again, we go back to the issue. This is really pretty straightforward. It's a contract formation issue. Who are the parties to this contract? And in that analysis, we don't apply any presumption in favor of arbitrability. We apply, if there's any ambiguity at all, state law principles. Now, I would argue first and foremost that the term affiliate in the contract isn't ambiguous. If Direct TV had wanted, I mean, you asked the question at that time, was Direct TV an affiliate? The answer, no, full stop. Diane May did not agree to arbitrate with Direct TV. Now, you can, you know, Direct TV... What's your answer to the employee's problem? I mean, is it your position that Ms. May also didn't agree to arbitrate against the employee who Mobility hires the day after this agreement to service her contract? No, I don't think she did under the plain language of the contract. Wouldn't that render the employee thing kind of pointless then? I mean, I assume Mobility has sort of an average employee turnover that would give them almost no protection at that point. If you could evade this arbitration agreement by just instead of suing Mobility, find the employee who joined the company the day after you signed your agreement and sue that person. I agree, Your Honor, that does sort of... It's on sort of the other end of the spectrum from the hypothetical that Your Honor raised about CNN buying a company and then, you know, having a defamation suit or the examples that Judge Posner raised in the Steinkamp case about you get run over in the street. You know, there are ways to draw the analysis that make it look more or less reasonable. I think the issue here, though, is there's an understanding, obviously, that there's turnover and change. You go back to what Your Honor said about the perspective of an objective individual entering into this contract. And DirecTV has pointed out in their brief, my colleague pointed out in his argument, that the language in the arbitration agreement does at times refer to things that seem clearly and obviously forward-looking. Assinease is obviously forward-looking. You understand at the time that you sign an agreement that an assinee is something that can't be known and can only occur in the future. The same thing with successor companies. You encounter a lot of these cases that are cited in the briefs don't go nearly as far afield from the original relationship as this one. They involve successor companies or assinees or agents who've been identified and are named by one of the parties. Those are inherently, explicitly even, forward-looking terms. An assinee has to happen in the future. A successor has to be someone who's named in the future. An affiliate, which is the issue that we're dealing with here, is not an inherently forward-looking term. There's nothing about the word affiliate by itself that tells us that an affiliate is someone that is going to come into existence in the future. To the contrary, you're reading it normally, reading the plain language. You read it as, these are who our affiliates are now. There's no reason to assume that it's going to continue to expand and cover a virtually limitless universe of entities in the modern world where companies continue to buy and merge and grow. You've got a company like Alphabet, Google's parent company, that owns dozens and dozens of other companies. As Your Honor alluded to, it could quickly reach what Judge Posner referred to in the Smith v. Steinkamp cases, a level of absurdity. What entitles you to go into the contract and using a plain meaning approach? If you got it in the same sentence, you have affiliates, you have employees, you have asinine, successors. What entitles you to pick affiliates out of the same, or identify them? Well, Your Honor, again, I think we're looking at what do these terms mean? An asinine is something that can only exist in the future. A successor company is something that can only exist in the future. We're not interpreting anything. We're looking at the plain dictionary meaning of those terms. When we look at an affiliate, that's simply not the case. Had DirecTV intended to include all future affiliates, it could have resolved this issue. They've got a lot of great lawyers. They could have solved this problem as easily as adding one word to the contract that says this applies to our future. What about employees, as Judge Harris mentioned before? That also doesn't... New employees may exist in the future, but it would seem that the contract means to prevent you from getting around this by suing new employees. Two responses to that. Number one, I believe addressing that employee falls... If we're looking at this from the standpoint of objectivity or the objective individual, I believe employees falls closer to the asinine successor end of the spectrum. It's not something that's inherently forward-looking, but anyone reading this contract would understand that a company like this has dozens and hundreds of thousands. I don't know how many employees AT&T has plenty, and that's going to change on a regular basis. How many affiliates does AT&T have? Why wouldn't the average person know those are going to change? Well, I certainly don't know it. I may not be the average person, but I have no idea, Your Honor. And I think it goes... My second response to that question goes to an issue that was raised by Judges Floyd and Harris about reading the contract as a whole, which DIRECTV has encouraged us to do. And the arbitration languages is on page 102 of the JAA. The judges honed in on the non-exclusive list of types of disputes that could be arbitrated, as an example of how we have to read this and how an objective person would read this contract and understand it. I would say those are all good points with respect to the scope of the agreements to be arbitrated. With respect to the issue of formation and who the contract is between, we could look at JAA 94, which is at the very beginning of the arbitration agreement, at the very top of the page, it says AT&T, or we, us, or our, refers to AT&T Mobility LLC acting on behalf of its FCC licensed affiliates doing business as AT&T. Now, I acknowledge that that is different than the paragraph that immediately follows the bullet-pointed list on 102. I acknowledge that affiliates is defined differently, or not defined, defined less precisely within the arbitration agreement itself. But if we're looking at the agreement as a whole and trying to have an understanding about how a reasonable person would have read this and understood who she was entering into an arbitration agreement with, I think we have to look at that. And I think that's a pretty- Statement that DirecTV is an affiliate? Are you saying we should look at what's on 94 and think of affiliates just as those who are doing business as AT&T? I don't have, I mean, I don't think it's important. There's no dispute in this case about whether or not AT&T or DirecTV are affiliates now. What I'm trying to get at here with this- You're not saying that the language on 94 restricts the scope of what affiliate means on 102 in the arbitration provision? No, I'm only suggesting, Your Honor, that if, as DirecTV has urged the court to do, the court is inclined to look at the agreement as a whole to get an understanding- Yeah, yeah, I'm just trying to make sure I understand what you think an affiliate is. And earlier you had said DirecTV would be an affiliate under the language on 102. And I want to make sure I'm understanding what you're currently saying about page 94. I did not intend earlier, Your Honor, to concede that DirecTV is an affiliate at this point. It hasn't been something that we have talked about in this case or needed to discuss in this case. If anything, I think it goes to the question of, is this an ambiguous term? If it's ambiguous, there's no definition other than what I just cited to on JA94. There's no definition of what an affiliate is at all in this agreement. You don't agree that DirecTV is today or in 2017 an affiliate of 18? No, I'm simply conceding for the purposes of argument that even if they are an affiliate today, it wouldn't apply. So they're not, but you're not saying that you, you're not giving up the point I'm not giving up that point, Your Honor. You might argue that they're not an affiliate. If the term is ambiguous, aren't we supposed to interpret it broadly as a contract? No, Your Honor. That's where we go back to the question of, is this a contract formation case or is this an arbitration scope case? And if this is a question of contract formation, okay, and we're not talking about what the scope of arbitrable issues is, but we're just talking about did Diana May, the plaintiff, ever enter into an agreement with DirecTV? Then we don't apply any presumption in favor of arbitration. We rely on standard state law contract interpretation principles. First of which comes to mind, especially in what is essentially a contract of adhesion between Diana May and AT&T when she wants to use a cell phone, is contra preferentum, right? We're going to interpret the terms of this agreement against the drafter, who obviously was AT&T. Now, there was a 28-J, I want to address this issue briefly before my time is up. There was a 28-J letter, in this case drafted by my colleagues with DirecTV, that suggested a recent Supreme Court case called Lamps Plus said we couldn't rely on contra preferentum. But all Lamps Plus said was that when there is a conflict between the FAA and the Moses H. Cohn presumption in favor of arbitration that arises under the FAA and a state law principle of interpretation such as contra preferentum, that the FAA presumption is overriding. But again, I can't stress enough, that's only with respect to disputes about the scope of arbitrable issues. The Lamps Plus does not say that a plaintiff can't rely on contra preferentum or any other basic first principles state law contract rule of interpretation such as contra preferentum that tells us how under West Virginia law this court should interpret the contract. In this case, I think it's very clear, you know, we have a contract of adhesion between Diana Mae and AT&T. If there is any ambiguity in that word affiliates, which it sounds like the court thinks that there is, then that has to be construed first against the drafter. It also has to be construed, you know, as we said, in light of the rest of the agreement, in light of, you know, the way that AT&T limited the term affiliate in other parts of its contract. And it has to be interpreted, you know, as compared to the other language talking about other types of agreement. I mean, I've been confused by DirecTV's argument that the forward-looking language in other parts, you know, closely related parts, of the contract means that the court should somehow add the forward-looking word future before the term affiliates. To me, the use of these other expressly, inherently forward-looking terms like S&Es and successors and the reference to future disputes tells me and should tell the court that when AT&T wants to write a part of this arbitration agreement that refers to something that is not currently in existence but may occur in the future, AT&T knows how to do that. Before your time is up, can I ask you, do you have a position on the district court's unconscionability ruling? You don't mention it in your brief, I recall. We do not, Your Honor. Unconscionability is a difficult issue, of course, in FAA cases. There are Supreme Court rulings that make that difficult. We do not rely on that at all. We would suggest that the court view that issue the same way that Judge Posner did in the Smith case and the way that the Eastern District of New York did in the Wexler case, which, by the way, I think is a critical case. We haven't talked about Wexler, but I would encourage the court to look to that. It was a case involving the TCPA, involving the same, involving the exact same arbitration agreement and involving, in fact, the same counsel for the parties. But we would encourage the court to look at the unconscionability, to avoid the unconscionability issue and look at this instead of a question of if the argument is it would be unconscionably broad, it also follows that there couldn't be a meeting of the minds as to who the parties to the agreement were. And we think that would be the wiser course. Thank you very much, Your Honors. I appreciate it. Just a few brief points. This discussion of whether it's really an issue of formation or whether it is, in fact, a question of interpreting the contract and scope. The first point I'd like to make on that, which I think the panel is already focused on, is that same argument would apply to agents and employees. So, and what sense would that make, as Judge Harris pointed out, if there was no contract that allowed employees hired on the very next day to invoke the arbitration clause? Can I ask you a question about that? Because I do, as my earlier question indicated, I do understand the idea that if this arbitration clause didn't apply to future employees in a way that would allow, it wouldn't make any sense if it would allow the consumer to kind of evade the arbitration clause. And instead of suing mobility, it sues the future employee for the service failure. But again, when I read it in combination with the rest of the contract or agreement, I am concerned because it seems as though on your understanding of what employee means, it's sort of the combination of the future and the lack of connection is what's disturbing to me because it seems that it would apply if like, say I was in court already, I'm suing someone who ran me over in his car. And you know, it's the first day of court, he comes running in and says, I just got hired by mobility. You've waived your right to sue me. I mean, that would be fine under your reading, right? Because now that future employee is us and I have waived my right to sue anyone who is included for any dispute or claim, anyone who's included in the term us. That would, there's two questions, right? The first question is, is it covered? It's covered. The second question is, is there a state law defense to applying it? So you really, your answer is there is no limitation in this agreement that would take care of any of this. We should construe the agreement to reach well beyond what is conscionable and then just use unconscionability doctrine to write in the limits that ought to be in this agreement. Correct. Okay. And let me give you an illustration. I'm sorry. I thought that was a rhetorical question, but okay. The 11th Circuit in the Doe versus Princess Cruz case, which involves sexual assault by one group of crew members against another. In that case, the court said five out of the 10 claims were non-arbitrable because the arbitration provision said that the claims that were covered were all claims between the parties arising from or relating to the crew agreement. The court said in its opinion, if you had just put a period after all claims between the parties, these other five claims, which were like false imprisonment and claims that seem far afield from the contractual agreement she was a bartender to provide bartending services for the crews. The court basically said it was a matter of drafting. Those claims will be included if you write it broadly enough. We wrote it broadly enough. Then the question becomes, is there some state law of defense? That's where the 8th Circuit's decision in Parham comes in because basically the 8th Circuit's saying, we're not going to prejudge that now. When that case comes up, we will decide it. We will decide whether invoking an arbitration provision on a false imprisonment claim or whatever the other claims were that were in Doe or the hypothetical about CNN. We'll decide whether that is unconscionable or violates public policy, but it is within the terms of the contract and the Supreme Court tells us we have to enforce these contracts as written. That's, I think, the solution to that. I just wanted to point out that, as I mentioned before, Granite Rock, which is 561 U.S. 287 at 298, basically says, once the parties agree that there's an agreement, then the rest of it is a matter of interpretation, which then the thumb on the scale in favor of arbitration comes into play. And the 9th Circuit, as we said in our briefs, the 9th Circuit did exactly this in the Adams case. And it's a very little, it's a short little unpublished federal appendix decision, but basically that case involved future affiliates of a successor company. And the 9th Circuit not only held that they were covered, but also said that even if it was ambiguous, the Supreme Court case law would require them to conclude that the claims brought against this affiliate had to be arbitrated, unless the court has further questions. So it's, again, I'm just trying to wrap my mind around kind of the intersection of unconscionability law. I mean, this just seems like a weird way to go about it, to draft these, hypothetically, I don't want, not your agreement. Imagine there was an agreement that said, you agree to arbitrate everything against everyone forever if you want this, I don't even want to make it self-service, if you want this plumber to fix your toilet, check this box. Okay, so your answer would be, that's right. Every, literally every claim you may ever have against anyone from now on, you can't go to court, but that's fine. We'll just go case by case by case and have courts decide which parts are conscionable and which parts are unconscionable. I mean, is that a good way to do business? Well, I think it's the way that, I mean, mostly I feel that, you know, that's how the Supreme Court has set up this whole... Well, but the Supreme Court has also said that we don't want to hear about unconscionability. Like, that's a very, very narrow doctrine. You can't use it to get in the way of arbitration agreements. So I just feel that... Well, if it treats arbitration agreements differently from other agreements, and so... But they've construed that pretty broadly. So I guess I'm not entirely comfortable with a regime in which we can have agreements that say, if you want me to fix your toilet, you can never sue in court again. And then just ask these plaintiffs to go case by case by case to say, this one's unconscionable, this one's unconscionable, this one's unconscionable. Why don't corporations just write normal arbitration agreements? Wouldn't that be a lot easier? Well, if we could have a crystal ball and predict all the future ways in which these claims could arise, and we could write a contract that would then not be attacked for being so long that no one will read it, we would do that. But I think this is a pretty good shot at it. Would you do that? I mean, why is it in AT&T's interest to bind someone who wants cell service to have to arbitrate an agreement later with the later affiliate CNN reporter who defames them? Why would AT&T care about covering that in its arbitration provision?  about whether they would or wouldn't care about this future company with a claim for defamation. All I can say is that there are cases in which the company has been sued that were technically within the scope of the arbitration provision that we haven't always insisted on enforcing the provision because we try to act reasonably. But we think this is within the heartland of the provision and that it should be arbitrated. All right. Thank you, sir. We'll come down and recounsel and then go to our last case.
judges: Henry F. Floyd, Pamela A. Harris, Allison J. Rushing